## In The United States District Court
for the District of Colorado

Thomas Madison Glimp,

*Plaintiff,*

v.

The Department of Commerce's
Bureau of Industry and Security and
the Department of State's Directorate
of Defense Trade Controls,

*Defendants.*

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2022 OCT 13  PM 4: 38

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

### Complaint for Replevin and Other Remedy and Relief

1.    I, Thomas Madison Glimp, now appear before the court *pro se* as an employee and owner of the closely held Colorado nonprofit Alloyed Enterprises and the skipper of the Colorado-registered Alloyed Company Cruiser.

2.    The purpose of the present pleading is to apprehend relief from injuriously imposed regulatory restrictions that have impaired my performance of study in preparation for trade, commencement of trade *per se*, and manufacture of tangible goods in my capacities as an employee and owner of a small business.

3.    Defendants began effectuating seizures and imposing other sanctions following alleged violations of commerce control policies governing the export of software source code and object code unlawfully induced by my former employer, Medcor of McHenry, IL, who transacts business in Palestine through a subsidiary named iConnect.

4.    Available evidence suggests that the consequences of these sanctions were heightened as a result of contents from a patent drafted by the law firm McDonnell Boehnen Hulbert & Berghoff relating to the production of a topical probiotic that makes reference to genetic engineering of *e. coli* bacteria.

5.    The legal consequences of sanctions have been to restrict the beneficial use of real, personal, and mixed property and appurtenant right-of-way easements so thoroughly as to comprise a taking within the constructs of *Barron v. Mayor & City Council of Baltimore*, 32 US 423 (1833) and *Lucas v. South Carolina Coast Council*, 505 US 1003 (1992).

6.    The norms of notice and hearing were not upheld as a result of Executive Orders that invoke the National Emergencies and International Emergency Economic Powers Acts so as to permit for the blocking of property, prohibition of particular transactions, and impositions of sanctions against persons who commit, threaten to commit, or support terrorism without satisfying procedural due process norms. Terrorism is of concern to the present matter insofar that users of the technology subject of transfer in the course of employment with Medcor during the 2014 and 2018 fiscal years are physically situated in Palestine, and current foreign policy construes the Palestinian government as a terrorist organization.

7.    When I attempted to apprehend an administrative remedy from these injuries through Defendant the Bureau of Industry and Security, the BIS expressly affirmed their belief that a violation of customs laws had occurred but would not entertain discussions about a resolution in absence of my tendering a detailed written admission of each alleged violation.

8.    Because the activity that allegedly comprises a violation of export regulations could be construed as violating criminal statutes outlined in the customs laws, I contend that officers of Defendant BIS are currently endeavoring to violate my Fifth Amendment privilege of immunity against self-incrimination. *Leary v. United States*, 395 US 16 (1969).

9.    As remedy from Defendant's injurious seizures, regulatory takings, and deprivations of procedural and substantive liberties, I pray for declaratory and injunctive relief providing for the rescission of sanctions, replevin of property, compensatory and punitive damages, and all other

6

and further remedy and relief enforced in my name and in the name of the company where I am an employee that the court deems just and proper.

10.    I further pray the court shall construe this pleading liberally, as inartfully advocated by a non-lawyer seaman who does not profess to possess special knowledge of the law.

## I.    **Parties**

11.    Plaintiff is the United States citizen Thomas Madison Glimp. I now appear *pro se* as an employee and owner of the Colorado nonprofit Alloyed Enterprises and the skipper of the Colorado-registered Alloyed Company Cruiser. Alloyed Enterprises has conducted a liquid packing business since March of 2017 and maintains a principal place of business at 1942 Broadway Street, Ste. 314C, PO Box 4504, Boulder, CO 80306.

12.    Defendant 1 is the Department of Commerce's Bureau of Industry and Security ("BIS") with a place of business at 1401 Constitution Ave., Washington, D.C. 20230. The BIS is responsible for enforcing laws relating to the import, export, and transfer of restricted goods, services, and data.

13.    Defendant 2 is the State Department's Directorate of Defense Trade Controls ("DDTC") with a place of business at U.S. Department of State, SA-1 Columbia Plaza, 2401 E. Street, N.W., Washington, DC 20037. The DDTC enforces laws relating to the export and import of goods, services, articles, and data deemed pertinent to the national interest.

## II.    **Jurisdiction and Venue**

14.    The District Court has jurisdiction over the below subject matter because this suit pertains to an actual controversy between a citizen and agencies of the United States relating to

the elective franchise of liberties conveyed by the Fourth Amendment, the due process,

privileges and immunities, and equal protections clauses of the Fifth Amendment, the dormant

commerce clause, and international treaties to which the United States is a party. 28 U.S.C.

§1331 and 28 U.S.C. §1343.

15.    The District Court and Court of Federal Claims have concurrent jurisdiction over the

claims for replevin of mixed personal and real property. 28 U.S.C. §1403 and §1491.

16.    The District Court and Court of Federal Claims have concurrent jurisdiction over the

claims for recovery of costs to conduct studies requested by Congress under 33 U.S.C. §1803 per

§35 of the Judiciary Act of 1789 and Dodd-Frank §217 per 28 U.S.C. §1492.

17.    The District Court may exercise supplemental jurisdiction over those claims otherwise

relegated to the jurisdiction of Court of Federal Claims pursuant to the supplemental jurisdiction

statute at 28 U.S.C. §1367 because they arise from a similar set of operative facts.

18.    Venue is appropriate with respect to Plaintiff's residency in the District of Colorado

where a substantial part of the events giving rise to the claim occurred. 28 U.S.C. §1391. Venue

is also proper because this is the District where the cause of action first accrued. per curiam

*Exxon Corp. v. FTC*, 588 F.2d 895 (3d Cir. 1978).

### III.    Causes for Suit In Redress

19.    The Civil Rights Act of 1871 as codified at 42 U.S.C. §1983 inflects a statutory cause for

suits in redress from deprivations of due process and equal protections of the law. §1986 grants a

cause to apprehend remedy from damages sounding in tort where a Defendant's exercise of due

precaution could have prevented a divestiture of protected liberty interests.

8

20.    The Declaratory Judgment Act at 28 U.S.C. §2201 and §2202, *Judiciary and Judicial Procedure: Declaratory Judgments and Creation of Remedy* conveys cause for the apprehension of declaratory and *Bivens* remedies from injuries caused through violations of the First, Fourth, and Fifth Amendments.

21.    The Little and Big Tucker Acts create a private right to remedy from takings of property affected in contravention of the Fifth Amendment. 28 U.S.C. §1346 and §1491.

22.    The Congressional Reference Statute at 28 U.S.C. §2509 as it embodies the imperatives of study set forth under Dodd-Frank §217 and 33 U.S.C. §1803 provides cause for the recovery of costs by parties who address standing Congressional inquiries through diligent study.

## IV.    <u>Statement of Fact: Predicates for Sanctions</u>

### A.    Plaintiff's Employment with Medcor

23.    From approximately January 2014 through December 2014 I worked for the Illinois corporation Medcor. In December 2014 it was mutually agreed that I would depart from Medcor. Our agreement was voided at this time.

24.    From September 2017 through December 2018 I worked for Medcor again as an independent contractor. Medcor separated our employment agreement in late 2017 by failing to offer full-time hours before abrogating part-performance and wholly voiding the contract in December 2018.

   a.    As will be shown below, the 2017 agreement was unlawfully extracted through undue influence proscribed by the law.

25.     Medcor is a workplace healthcare solutions company with a principal place of business in

McHenry, Illinois. Medcor conducts business through an affiliated software development

company by the name of iConnect. **Exhibit A.**

26.     iConnect is owned principally by Medcor's CEO Philip Seeger and CIO Hattim Sahouri.

Sahouri is a Palestinian national who immigrated to the United States some time ago.

27.     Medcor's subsidiary iConnect maintains an office in Ramallah, Palestine. Per the

professional networking website LinkedIn, iConnect employs persons jointly in conjunction with

the Palestinian Authority, *i.e.*, a faction of the Palestinian government. **Exhibits B.(1) and B.(2).**

    a.   On information and belief, the reason that iConnect's employees report simultaneous

        employment at iConnect and the Palestinian Authority is that telecommunications and

        technology in Palestine are centrally controlled by a monopolistic service provider

        known as the Paltel Group.

    b.   The Paltel Group was founded by former Palestinian leader Yasser Arafat and exerts

        monopoly control over telecommunications services and facilities in Palestine,

        including those which iConnect uses to develop and distribute its product(s).

28.     In or about June, July, and August of 2014 in the course of off-premises employment

with Medcor (*i.e.*, at a geographic locale not associated with Medcor's corpus) I was tasked to

engage with iConnect personnel in Palestine directly via email and Skype.

    a.   The scope of engagement between myself and iConnect personnel was limited to the

        identification and remediation of glitches and under-performing features in a

        healthcare software product.

    b.  Particularly, I executed a debugging procedure by cross-testing software application functionalities across a variety of browsers in an array of use-cases before compiling written reports about what did not work in the manner intended.

    c.  Testing and discussions concerning dispositions from the performance of testing protocols were communicated via computers equipped with virtual private networks.

29.    In or about May, June, July, August, September, October, and November, and December of 2018 in the course of off-premises contracting for Medcor (*i.e.*, from a geographic locale not associated with Medcor's corpus) I was directed to engage with Medcor's CEO Seeger and CIO Sahouri regarding the development of a healthcare triage software product.

    a.  In the course of employment with this Illinois-chartered company, I sent Sahouri design assets and objects that contain embedded source and/or object code inclusive of style sheets.

    b.  Sahouri in turn transferred these design assets containing software source and/or object code to iConnect personnel in Palestine. These transactions are considered "deemed exports" in the context of applicable customs laws with respect to the ultimate end-user.

30.    While the healthcare triage software product subject of development is used by hundreds of domestic companies to ensure that employees who are injured on the job receive adequate care in an appropriate temporal window for the purposes of improving healthcare dispositions and creating cost savings, it is nonetheless subject to regulation within the constructs of the Export Administration Regulations (EAR) and United States Munitions List (USML).

31.    To this effect, because the source and/or object code subject of transfer relates to an advanced telecommunications platform used to facilitate HIPAA-compliant voice and video chat

and electronic medical record transfers between parties in geographically disparate locales, it is formalistically construed as dual-use civilian and military technology.

32.    The cause for said designation lies in the reality that the same technology valued for its ability to protect the privacy of United States citizens is capable of being used as both an encryption tool and surreptitious listening device. This categorization persists "even though the [device] may also have innocent uses." 15 CFR §742.13.

33.    On information and belief, transfers of this technology are subject to restriction because the privacy-preserving elements of same can also be used to obscure dialog about terrorism and terrorist activity or to intercept plans for counter-terrorism defense and deterrence.

**B.    The Palestinian Authority and Terrorism**

34.    According to the United States Treasury's Office of Foreign Asset Control the United States government considers the Palestinian Authority an attaché to a terrorist organization.

35.    To this effect, the Counter-Terrorism Sanctions section of the Policy Issues page of the United States Treasury's website hosts a terminal directory named "Palestinian Authority." The first header on this webpage is titled "What Are the Prohibitions On Dealing With The Palestinian Authority?"

36.    Below this header is a block of text that establishes, *"As a result of elections held in January 2006, representatives of HAMAS currently form the majority party within the Palestinian Legislative Council (PLC) and hold high-level offices within the Palestinian Authority (PA) including the position of Prime Minister. HAMAS is a target of three OFAC terrorism sanctions programs, resulting in the blocking of any property and interests in property of HAMAS that are in the United States or hereafter come within the United States, or that are in or hereafter come within the possession or control of a United States person. OFAC has*

12

*determined that, as a result of the recent elections, HAMAS has a property interest in the transactions of the Palestinian Authority. Accordingly, pursuant to OFAC's terrorism sanctions programs, U.S. persons are prohibited from engaging in transactions with the Palestinian Authority unless authorized."*

37.     Per definitions provided by the Treasury's OFAC, the designation of iConnect personnel as being under the dual-employ of iConnect and the Palestinian Authority renders transactions with iConnect subject to sanctions on the grounds of deterring terrorist activities.

38.     Because a substantial part of my income and Alloyed Enterprises' revenues from the 2018 fiscal year were accrued in the course of developing design assets for an Illinois company that in turn exported these assets to persons employed by the Palestinian Authority, and *vis-à-vis* HAMAS, Alloyed Enterprises and I are and have been subject to blockades, seizures, blacklisting, and other forms of sanctions.

**C.     EAR and DDTC As Mechanisms of Enforcing Anti-Terrorism Sanctions**

39.     The preceding excerpt from Treasury's Office of Foreign Asset Control ("OFAC") makes reference to three OFAC terrorism sanctions programs applicable to transactions with non-party Medcor and its affiliates.

40.     On information acquired directly from Special Agent Caitlin (sp?) Watson of the Bureau of Industry and Security during an oral interrogatory that occurred in September 2022, the Treasury's OFAC relies on external partner agencies to conjunctively enforce these sanctions programs. To wit,

41.     Defendant the Bureau of Industry and Security ("BIS") is a subdivision of the Department of Commerce that works jointly with the Treasury's OFAC to promote United States

exports, enforce export controls, and deter terrorism by enforcing the Export Administration Regulations.

42.    Defendant the Directorate of Defense Trade Controls ("DDTC") is a subdivision of the Department of State that works in conjunction with the Treasury's OFAC to advance United States foreign policy objectives by enforcing customs laws and regulating transfers of assets defined in the United States Munitions List and International Trafficking in Arms Regulations.

43.    OFAC, DDTC, and BIS sanctions are pertinent to the present matter because export and import controls are carried out along two primary axes. The first such method is by restricting transactions and imposing sanctions against parties that engage in transfers with restricted end-users. The second method is by imposing restrictions against certain uses of imported or exported articles.

44.    Restricted end-users include nation-states and political factions whom the Congress has determined to be terrorists or sponsors of terrorism, and individuals or entities adjudged guilty of proscribed acts through judicial or administrative proceedings. Per the above from OFAC, the Palestinian Authority and parties that share interlocking or overlapping interests in property with the Palestinian Authority are restricted parties within the meaning of the EAR and ITAR.

45.    Restricted end-uses include activities in support of terrorism or inconsistent with national security and foreign policy interests. Examples of restricted end-uses include the transfer of nuclear armaments, chemical munitions, biological organisms predisposed to conveying disease, toxins, lasers, spacecraft, and the transfer of technologies capable of obscuring the substance of discourse with restricted end-users or concerning restricted end-uses, or which can be used to surreptitiously listen in on counter-terrorism policing efforts.

46.     The EAR and ITAR are further stipulated as being applicable to all associated documentation, plans, diagrams, models, formulae, tables, designs, specifications, manuals, and instructions associated with the foregoing, and all means of developing, maintaining, transferring, and financing same.

47.     Because the transactions outlined in §4.(A) are restricted as a result of the end-users and for potential end uses, they are subject to the EAR and ITAR and thus capable of precipitating OFAC, EAR, and ITAR sanctions.

### D.    Plaintiff's Interrogatory With BIS Agents About Employment With Medcor

48.     In or about August and September of 2022, I discussed sanctions arising from Medcor's knowing election to induce exports to restricted parties with Special Agent Scott Douglas and Caitlin (sp?) Watson of the Bureau of Industry and Security's Chicago and Dallas field offices, respectively.

49.     In a series of conversations with Agent Scott Douglas, Agent Douglas confirmed that he was personally apprised of these transactions and stated that the BIS was actively investigating the topic.

50.     In a conversation with BIS Special Agent Watson that occurred on 9/13/2022 at approximately 10:48am MST, Agent Watson listened to a conveyance concerning my exchanges with persons from the Palestinian Authority induced by non-party Medcor's Seeger and Sahouri.

51.     Agent Watson responded by providing an unwaveringly clear oral opinion that all of my direct and indirect transactions (*i.e.*, "deemed exports") with Medcor/iConnect personnel situated in Palestine are restricted transactions subject to the Export Administration Regulations.

52.     Agent Watson further continued by stating that in order for the BIS to consider a remedial response and administrative remedy, I would need to furnish a formal written

declaration certifying that I truthfully and completely delineated all of my sins before the BIS
would so much as consider rendering a determination about penance and absolution.

**E.     EAR 99 Due Diligence Obligations**

53.     In the preceding conversation with Agent Watson, Watson further provided that the
transactions of record are categorized as EAR 99, *i.e.*, a special designation of export eligible for
exemption from sanctions even when sent to restricted end-users.

   a.   On information and belief, the reason that healthcare technology exports are
        categorized as EAR 99 arises from facets of the Geneva Convention and the
        Additional Protocols thereto that convey blanket amnesty to persons engaged in the
        provisioning of medicine on an international plane.

54.     According to a publication titled "Sanctions and Export Controls: Focus On Medical
Devices" by the law firm Winston & Strawn LLP, even when exports are exemptable from
sanctions, parties must diligently claim licenses from Defendant BIS to avoid sanctions.

55.     The process of claiming a license exemption requires that one write and give notice
concerning their intent to engage with a restricted party or in a restricted activity before doing so.
The disclosure must contain a comprehensive narrative account of the nature and purpose of the
transaction and the applicable license exemption that makes it permissible.

   a.   Both the Treasury's OFAC and the State Department's DDTC impose similar
        requirements that parties engaged in exemptable transactions, or who intend to
        engage in exemptable transactions, must give appropriate notice about applicable
        licenses and/or license exemptions before engaging in the transactions of interest.

56.     Because I do not possess a JD or JD/MBA and am painfully obviously not an expert in all
facets of law relating to multi-national commerce, export and import practices, and foreign

policy, I assumed a reliance interest in Medcor's open commencement of trade with iConnect and did not set forth claiming licenses from Defendants at any point until about July or August of 2022 long after the consequences of sanctions were evident.

**F.    Employment With Alloyed Enterprises: Additional Restricted End-Use**

57.    In March 2017 I opened Alloyed Enterprises (formerly d/b/a "Olfactory Enhancements Ltd.") through the Colorado Secretary of State with the intent of producing tangible consumer non-durables using my own money.

58.    The first product I sought to create was a topical probiotic that improved upon a good produced by another firm in the industry. To wit,

59.    In approximately May of 2016 I read an article about an inventor by the name of David R. Whitlock. The article was about patents recently granted to Whitlock for his claimed method of improving skin health through the re-introduction of naturally occurring beneficial bacteria.

60.    In May of 2016 I also found that Mr. Whitlock, a biologist by trade, was not an especially savvy marketer. To this point, I read Mr. Whitlock's opinion that his product was optimally complemented by a shower cessation regimen.

61.    As an individual who possesses ordinary skill in the art of marketing, I began exploring alternative means of selling a competing ware using marketing tactics that are complementary to modern hygiene practices.

62.    In or about May and June of 2016 while researching the technology underlying Whitlock's grant, I found that the science journal *Nature* recently published articles disclosing that *nitrospira* bacteria closely related to the beneficial *nitrosomonas* bacteria in Mr. Whitlock's product are capable of producing the same active ingredient, *i.e.*, nitric oxide.

63.    In May and June of 2016, after discussing generalities about patent law with an attorney who has successfully prosecuted patent applications, I received counsel to the effect that claiming an identical use of a closely related bacterial specie could be construed as obvious subject matter and would thus likely be deemed ineligible for a grant.

64.    In May and June of 2016 the attorney who advised about the preclusion of obvious subject matter counseled that pursuing a divergent use of a composition containing the closely related bacteria as part of a "foot in the door" approach was my best opportunity to acquire an interest in licensing rights providing for the production of a related therapeutic compound.

65.    In January 2017 I retained Jordan Pringle, Esq., of McDonnell Boehnen Hulbert & Berghoff ("MBHB") to assist me in the filing of claims to a method of improving upon Whitlock's product. MBHB also assigned USPTO practitioner John Dominick Cravero to my account.

66.    The purpose of the retention agreement was to assert interim interests in a probiotic deodorant product with the long-term goal of developing a probiotic therapeutic.

67.    The method of improvement was centered upon substituting the ammonia-oxidizing and nitric oxide generating *nitrospira marina* bacteria for the ammonia-oxidizing and nitric oxide generating *nitrospira Europa* contained in Whitlock's products.

68.    Claims to transformative improvement primarily relate to the fact that bacterial compositions containing *nitrospira marina* are more durable as packaged shelf-keeping units than those containing *nitrospira Europa*.

69.    The reason enhanced durability constitutes a useful improvement beyond the state-of-the-art is that Whitlock's goods require very costly refrigeration during warehousing, shipping, and

handing. This renders them prohibitively expensive relative to substitute anti-inflammatories available on the market.

70.    To this point, a 4oz bottle of Whitlock's topical spray costs approximately $40.00 plus $25.00 in shipping whereas other topical anti-inflammatories costs $5-15.00 with shipping costs of $5-10.00. By eliminating extraneous shipping and warehousing expenses, it would have been possible to sell a near-perfect substitute at or about the prevailing market rate for topical anti-inflammatories rather than 4-500% above same.

71.    The concept was fundamentally sound in that pharmaceutical companies SC Johnson & Co. and Pfizer subsequently purchased licensing rights to Whitlock's products despite their prohibitively expensive cost and corresponding lack of market penetration.

   a.   Information has caused me to conclude that demand for licensing rights exists because probiotic topical anti-inflammatories can be used in situations where standard anti-inflammatories cannot (*e.g.*, in the event of allergy or in post-surgical applications where use of an impermeable coagulated gel would impair the oxidation of dermal tissue and delay healing, etc.).

72.    At the onset of my attorney-client relationship with MBHB, it was agreed that MBHB would assist in making claims that were ultimately most conducive to the successful prosecution of a patent application that fulfilled this end.

73.    It was further agreed that this was to be achieved by making claims to a probiotic composition that could later be repurposed as a dermal therapeutic *ala* Whitlock.

74.    In or around early April of 2017, it was acknowledged by the parties orally and in writing that the Colorado business entity Alloyed Enterprises (previously d/b/a "Olfactory Enhancements Ltd.") was the real party in interest.

75.    In or around April of 2017 I conceded MBHB a Form AIA82 Power of Attorney at the
suggestion of MBHB personnel for the limited purpose of streamlining representation before the
PTO. After I made this conveyance, an application for a patent was filed without my informed
consent and with apparent malice. Inferences of malice are derived from:

    a.   The injurious nature of the document that later went to publication;

    b.   MBHB's willful concealment of a material conflict of interest at the onset of our
        attorney-client relationship which persisted until MBHB personnel became apprised
        of law enforcement and regulatory agency investigations of their other clients and
        consequential duties to comply, with State bar standards for propriety at risk of
        suspension from the practice of law; and

    c.   MBHB's advertisement that it possesses the knowledge required to prevent the
        injuries of concern by dispensing appropriate counsel regarding the need to obtain
        licenses through the BIS even when conducting domestic production activities.

76.    The reason that the document MBHB personnel tendered to the PTO is likely a source of
injury is that it makes reference to methods of genetically engineering *e. coli* bacteria in
compositions that featured *nitrospira marina* without specifying that the *e. coli* are of a non-
pathogenic variety.

77.    The resultant claims are facially problematic from a practical perspective insofar that *e.
coli* does not even belong to the same phylogenetic domain as *nitrospira marina*. With this in
mind, it is dubiously feasible to conjoin the two organisms into a being capable of life, and much
less as a useful product.

78.    The underlying claims are problematic from a regulatory compliance perspective with
respect to the designation of biological organisms capable of injuring others (*e.g.*, *e. coli*) as a

restricted end-use subject to the Export Administration Regulations per the conveyance of 15 CFR §744.4 *et seq* that strictly regulate the development of biological compounds situated in the United States even if not presently being exported.

    a.  While patent applications and grants can be exempted from sanctions under the Export Administration Regulations, exemption requires claim of a license or comprehensive disclosure of all intended uses and methods of using the technology in question. This is inapplicable to the present matter for lack of qualifying public disclosure of all intended uses for the technology (e.g., medicine as opposed to a deodorant) in the application.

79.    Because MBHB failed to advise of the obligation to claim licenses when handling this restricted matter, possession of this recipe is statutory grounds for EAR sanctions, including but not limited to seizures of mail, seizures of data packets underlying properly functioning internet, takings of property, and exclusion from lines of employment which I am and have been qualified to work in for the duration of the temporal interval subject of this complaint.

80.    Moreover, the BIS provided information to the effect that they are a very small organization with a few hundred employees tasked to police 7,000,000,000 humans around the planet for compliance with the export laws. This gives rise to an enforcement paradigm that magnifies the potential for the publication MBHB drafted to be a causal source of injury. To wit,

81.    Defendants and affiliated agencies acting on behalf of parties tasked to make foreign policy and enforce anti-terrorism laws use data mining and computer algorithms to bridge the gap between the imperatives of regulations that they are tasked to enforce and their budget-constrained human capital. Some of the computerized algorithmic risk assessment instruments used for the purpose of identifying violations of the EAR, customs laws, and other counter-

terrorism laws are described under 42 U.S.C. §2000ee-3, *Privacy and Civil Liberties Protection and Oversight: Federal Agency Data Mining Reporting* where limits on uses of a system of conducting "queries, searches, or other analyses to discover or locate a predictive pattern or anomaly indicative of terrorist or criminal activity on the part of any individual or individuals" are established.

82.    The result of this deferral to automated detection of potential or actual violations of customs and counter-terrorism laws is similar to Major League Baseball's transition away from umpires who strive for objectivity to an automated strike zone that measures the location of the ball as it crosses the plate using lasers. Rather than an individual conducting an investigation and rendering a conclusion about customs compliance that accounts for common-law context, a highly sophisticated computer uses a profile generated from mined data to make rigid determinations about customs compliance and risk for terroristic activities.

83.    This system is very useful for the necessary purpose of defending against terrorism insofar that it allows for the rapid examination of an extraordinary quantity of parties using objective evaluative criteria. Given how impactful the attacks of September 11th of 2001 were on American families, it is understandable why we have a system like this in place.

84.    However, the same system is flawed because it is prone to errors arising from (1) inter-relater reliability, *i.e.*, the problem that arises when algorithms receive inaccurate input entered by biased parties or persons who intend mendaciously effectuate partisan or economic goals, and (2) infra-marginality, *i.e.*, statistical misclassifications by way of formulaic assay that generate inaccurate inferences about the probability a given event might occur which do not correspond to a party's actual behavior, motives, or intentions.

a. Inter-relater reliability is of concern to the present matter because the Senate Judiciary Committee and Department of Justice Office of the Inspector General found that parties I testified against concerning systemic mortgage-backed securities fraud who MBHB claims as their clients have been caught hiring persons to mislead the Department of Justice in opaque, *ex parte* counter-terrorism tribunals where systematic deprivations of due process were found to have occurred.

b. Infra-marginality is an issue in that the quantitative risk-assessment instruments which Defendants use to enforce customs laws are likely to misconstrue the publication which MBHB attributed to me in a way that infers I pose a risk of committing biological terrorism that does not actually exist.

85. Despite these concerns, the Defendants employ a "shoot first, remediate later" method of defending against terrorism. Consequentially, the mere presence of a potential biological terrorism threat gives rise to express grounds for regulatory sanctions of the variety described in this complaint.

## G.    Declared Emergencies as Cause for Abrogation of Due Process

86. An anticipable defense which BIS Spec. Agent Watson already raised and that Defendants are likely to continue raising relates to the absence of written notice, record of a hearing, and formal placement on sanctions or debarment lists.

87. This provided, the denials of due process subject of this complaint are relatively easy to explain because they arise from known powers of the Federal government to abrogate due process in cases of rebellion, insurrection, and other exigent instances.

88. While no credible allegation of rebellion or insurrection can be asserted, there is a plain and linear association between (1) a series of Executive Orders prescribing emergency anti-

terrorism sanctions, (2) boycotts indicative of sanctions, (3) seizures of information indicative of

sanctions, and (4) induced activity giving certain cause for the imposition of sanctions on the

grounds of deterring terrorism and thwarting alleged supporters of same...

89.    To this effect, in an article from March 2020 titled "Emergency Powers and

Constitutional Limits" written by the law firm of Akin Gump Strauss Hauer & Feld, it is set forth

that *"The federal government is one of 'enumerated powers.' ... Much of its power to respond to*

*national emergencies is based on statutory authority derived from the Commerce Clause, which*

*gives Congress broad ability to regulate foreign and interstate commerce. It can also tax and*

*spend for 'the common Defense and general Welfare.' ... Although these powers are granted to*

*Congress—not the President—that does not stop the President from responding to a national*

*emergency via executive action. As Justice Jackson explained in his famous concurrence in*

Youngstown Sheet & Tube Co. v. Sawyer, *the extent of the President's authority in an*

*emergency will depend on whether he acts in accordance with Congressional will. Accordingly,*

*any presidential (or other executive agency) action is subject to review and curtailment by the*

*federal courts if it is deemed at odds with Congress's explicit or implicit directives, or otherwise*

*clearly exceeds recognized authority."*

90.    Applicable Executive Orders that draw exigency powers under the International

Emergency Economic Powers Act and National Emergencies Act and awaken the dormant

commerce powers from Art. I, §8, Cl. 3 include but are not limited to Executive Order 13224,

Executive Order 13372, and Executive Order 13886. To wit,

91.    EO 13224, *"Blocking Property and Prohibiting Transactions With Persons Who Commit,*

*Threat To Commit, or Support Terrorism"* was entered into the Federal Register on September

25th 2001 by the pen of President George W. Bush.  EO 13224 invokes the International

Emergency Economic Powers Act, the National Emergencies Act, the United Nations

Participation Act, and a variety of United Nations Security Council Resolutions as the basis to

combat terrorism and terrorist activity by suspending due process for the purpose of imposing

unilateral sanctions against persons with direct and tangential associations to terrorist

organizations (*e.g.*, the Palestinian Authority).

92.    EO 13372, *"Clarification of Certain Executive Orders Blocking Property and*

*Prohibiting Certain Transactions"* was entered into the Federal Register on February 14th, 2005

by President George W. Bush to amend EO 13224. EO 13372 draws authority from the

International Emergency Economic Powers Act, the National Emergencies Act, and the United

Nations Participation Act to suspend the exemption of unilateral sanctions to parties engaged in

the provisioning of healthcare or medicine where doing so would imminently jeopardize the

safety of United States Armed Forces. This is a particular instance where an Executive Order

contravenes legislative mandates emanating from the Congress and draws into question the

jurisprudence from *Youngstown*. It is pertinent to the present action with respect to Alloyed

Enterprises' business as a producer of healthcare goods and provisioner of a limited range of

services to a healthcare company.

93.    EO 13886, *"Modernizing Sanctions To Combat Terrorism"* was entered into the Federal

Register on September 9th, 2019 by President Donald J. Trump. EO 13886 continues to modify

EO 13224 passed in the weeks following September 11th, 2001 by further restricting transfers,

payments, exports, and other business transactions with parties directly and peripherally involved

in terrorism. However, 13886 stipulates that the modifications are intended to be enforced so as

to facilitate the Middle East peace process and that the order is to be enforced consistently with

applicable laws.

94.    The lattermost provision citing compliance with law as an executive mandate is important

for two primary reasons.

    a.    First is that it renders the tenets of EO 13372 relating to the provisioning of medicine

        moot as a consequence of the conveyance from 18 U.S.C. §2339A, *Crimes and*

        *Criminal Procedure: Terrorism; Providing Material Support to Terrorists*, which

        stipulates that *"Whoever provides material support or resources or conceals or*

        *disguises the nature, location, source, or ownership of material support or resources,*

        *knowing or intending that they are to be used in preparation for, or in carrying out, a*

        *violation of [counter-terrorism laws], or in preparation for, or in carrying out, the*

        *concealment of an escape from the commission of any such violation, or attempts or*

        *conspires to do such an act, shall be fined under this title, imprisoned not more than*

        *15 years, or both, and, if the death of any person results, shall be imprisoned for any*

        *term of years or for life. As used in this section, the term "material support or*

        *resources" means any property, tangible or intangible, or service, including currency*

        *or monetary instruments or financial securities, financial services, lodging, training,*

        *expert advice or assistance, safehouses, false documentation or identification,*

        *communications equipment, facilities, weapons, lethal substances, explosives,*

        *personnel (1 or more individuals who may be or include oneself), and transportation,*

        ***except medicine*** *or religious materials."*

    b.    Second is that the Administrative Procedures Act expressly requires notice, hearing,

        and an opportunity to make corrective compliance efforts in absence of circumstances

        not applicable to me or Alloyed Enterprises. This is set forth at 5 U.S.C. §558,

        *Imposition of Sanctions; Determination of Applications for Licenses; Suspension,*

*Revocation and Expiration of Licenses* which establishes that *"Except in cases of willfulness or those in which public health, interest, or safety requires otherwise,* **the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given (1) notice by the agency in writing of the facts or conduct which may warrant the action; and (2) opportunity to demonstrate or achieve compliance with all lawful requirements.***"

95.    Because there are no valid claims to be made that I have willfully participated in terrorist activities or comprise a threat to the public health or safety, no sanctions should be imposed against me or Alloyed Enterprises within the applicable legal framework. Nonetheless, because the sanctionable transactions occurred in 2014 and 2018, it is plausible on its face that *ex parte* orders for sanctions were entered before the relevant administrative paradigm was reversed by President Trump in 2019.

**H.    Sanctions as Improper Victim-Blaming**

96.    Defendants' imposition of sanctions is unjust because they amount to an unlawful deprivation of due process that comprises victim-blaming. To this point, Alloyed Enterprises and I are the victim of violations of civil and criminal statutes that prohibit non-party Medcor from electing to do business in Palestine in a way that causes others to suffer injury.

97.    Particular statutes that criminalize or otherwise prohibit Medcor's conduct include but are not limited to the following:

98.    Section one of the Sherman Act at 15 U.S.C. §1 proscribes commencing trade in foreign combinations that restrain trade as a felony act. The parallel Federal Trade Commission Act at 15

U.S.C. §45a(3)(A) particularly forbids unfair and deceptive acts and practices in foreign commerce that have a foreseeably adverse effect on commerce and trade.

      a. To the extent that Medcor is represented by competent counsel, it should have realized that its conduct was likely to precipitate the seizures, boycotts, and blacklisting subject of this complaint and taken appropriate measures to counteract these sources of injury before they occurred, including through the provisioning of appropriate guidance about licensing requirements.

99. The Export Control Reforms at 50 U.S.C. §4819(a)(2)(B), *War and National Defense: Export Control Reform; Authority and Administration of Controls, Penalties – Specific Unlawful Acts* expressly provides that *"No person may cause… command… induce… or approve the doing of any act prohibited, or the omission of any act required by this subchapter, the Export Administration Regulations, or any order, license or authorization issued thereunder."*

100. §4819(b), *Penalties – Criminal Penalties* continues by stating that *"A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids and abets in the commission of an unlawful act described in subsection (a) – (1) shall not be fined more than $1,000,000; and (2) in the case of the individual, shall be imprisoned for not more than 20 years, or both."*

101. Without caveat, Medcor's Seeger and Sahouri caused, commanded, and induced violations of the Export Administration Regulations as the embody the Sherman Act. Because Seeger and Sahouri violated criminal statutes when they knowingly chose to engage in behavior that the Congress has expressly criminalized or otherwise prohibited, it is unreasonable, unjust, and unlawful to impose sanctions against victims of their misconduct rather than the culprits.

## V.    Statement of Fact: Substance of Seizures and Blacklisting

102.    For the duration of Alloyed Enterprises' existence dating back to its formation in Denver,

CO in March 2017, I noticed a continual and ongoing series of disruptions to the stream of

information flowing through telephone and internet services.

103.    This became plainly apparent in 2019 when I was able to photograph seizures in a library

by a professional team of network engineers and even more evident when Alloyed Enterprises

was subject to a concerted boycott by internet providers that has been formally acknowledged by

orders of the Illinois Commerce Commission.

104.    Specific incidents which caused me to become aware of sanctions despite Defendants'

failure to uphold the due process norms of notice and hearing are as follows:

## A.    Seizures and Blacklisting By ISPs and OEMs

105.    Defendants enforce violations of the export laws in part through blacklisting. This fact is

evidenced by the provisions of 15 C.F.R. §760.4, *Export Administration Regulations: Restrictive*

*Trade Practices and Boycotts; Prohibitions, Evasion* where it is provided that it is unlawful for

any one party to one or more transactions subject to the EAR to *"place a person at a commercial*

*disadvantage or impose on him special burdens because he is blacklisted"*.

106.    In or about July of 2020 in my capacities as an employee of Alloyed Enterprises I secured

leaseholds at (1) 1942 Broadway Street, Boulder, CO 80302, (2) 40 E. 9th Street, Unit 402,

Chicago, IL 60605, and (3) 21155 Smith Switch Rd., Ashburn, VA 20147 for use in commerce

and trade. I subsequently registered these properties as a private subdivision through the

Colorado Secretary of State for the sake of administrative convenience associated with the

effective mitigation of regulatory compliance burdens.

107.    These combined reversionary interests in mixed property: (1) were appropriately zoned

for commercial use, (2) included express promises of commercial-grade fiber internet suitable

for use in trade, (3) provided for unequivocally free ingress to and egress from the premises, and

(4) afforded access to navigable United States waterways for and by the Colorado-registered

Alloyed Company Cruiser.

      a.   In my capacity as an employee of Alloyed Enterprises, I acquired a personal water

         privilege and CORSAR permits from the State of Colorado to augment promised

         beneficial uses of these private and exclusively held interests in property.

108.    After securing the said interests in the use of land and all associated rights and privileges,

Alloyed Enterprises and its affiliate Alloyed Enterprises IL Company acquired appropriate

commercial licenses from the Cities of Boulder and Chicago in the manner required to make use

of this interest in mixed property to the fullest extent accorded by the terms of the leaseholds in

the course of conducting trade from the Alloyed Company Cruiser.

109.    Despite the fact that Alloyed Enterprises and its limited associate properly held all rights

and licenses required to use the premises for commercial intercourse, the company was subject to

a boycott by Microsoft, AT&T, Comcast, and RCN Telecommunications.

110.    Practically, this boycott took on the form of a concerted series of denials of access to

essential business facilities comprising secure, business-grade telecommunications services and

facilities needed to engage in commerce and conduct trade.

      a.   This boycott occurred despite the tacit embodiment of the Equal Protections clauses

         of the Constitution at 47 U.S.C. §202, *Telecommunications: Common Carriers;*

         *Discrimination and Preferences* that expressly prohibits all conceivable manners and

'forms of discrimination in the provisioning of essential telecommunications carrier services and facilities.

111.    The specific nature of this boycott by RCN, Comcast, AT&T, and Microsoft is as such:

112.    **RCN.** In or about July of 2020 RCN Telecommunications repeatedly refused to provide a good title for commercial internet. Particularly, my name was written on the proposed bill of sale as "Thomas Glimp Glimp." When I requested changes providing for strict compliance in presentation to avoid the disruptions to connectivity stipulated by the *E911* clause in the proposed service-legal agreement, RCN refused to make them before declaring that it "lost the sale" and ceasing to respond to communications.

113.    **Comcast.** In or about August of 2020 Comcast Corporation repeatedly refused to provide fiber internet service after warranting that it was feasible to do so. Particularly, Comcast stated that it would be able to perform an installation in a commercially-zoned part of Chicago without issue, even if doing so required that it run a fiber internet connection through a window from the nearest local fiberoptic node approximately 30 yards away from the building.

114.    After it made this statement, Comcast refused to perform an installation of fiber service. A lengthy series of exchanges with Comcast salesman Edward Mortimer eventually resulted in the disposition that Comcast would only sell Alloyed Enterprises cable internet but not fiber as was previously promised. No explanation as to why this about-face occurred was given.

115.    **AT&T.** In or about September of 2020 AT&T Corporation represented that it would install fiber internet. On or about September 17th, an AT&T installation technician appeared with a fiber internet installation kit. After we discussed the installation process, AT&T's employee indicated that he would return the next day to complete the job. When AT&T personnel returned, they set forth installing a dial-up internet connection that plugged into a phone jack rather than a

state-of-the-art fiber internet connection in the manner that was agreed. Use of this device

coincided with continuous disruptions to service that impaired a free flow of information.

116.    **Microsoft.** In or about July, August, and September of 2020 I engaged in a series of

exchanges with Microsoft volume licensing distributor the Center for Computer Resources about

procuring licenses for Windows Enterprise E5. Similarly to RCN, Microsoft's volume licensing

distributor presented a series of non-conforming titles. Only after the sixth effort did Alloyed

Enterprises receive a conforming title and agree to the transaction.

117.    After Microsoft presented this title, it accepted approximately $650 in valuable

consideration for a pair of licenses. After accepting valuable cash consideration and before it

turned over the license keys, Microsoft returned the funds without a reasonable explanation.

118.    In light of the implications of 47 U.S.C. §1005, *Telecommunications: Interception of

Digital and Other Communications; Cooperation of Equipment Manufacturers and Providers of

Telecommunications Support Services* where it is set forth that companies like AT&T, Comcast,

RCN, and Microsoft are lawfully obligated to cooperate with Attorneys General to enforce the

laws of the United States, this string of concerted denials of service appears characteristic of the

variety of blacklisting contemplated by 15 CFR §760 *et seq.*

119.    **Consequential Injuries from Blacklisting.** Blacklisting of the variety set forth above is

injurious insofar that it is not possible to conduct trade without these essential business facilities.

To this end, the feasibility of trading bonds in arbitrage markets is a function of how much

latency exists. Without fiber-optic internet, excess latency persists and trade cannot happen.

120.    Because Alloyed Enterprises and I are entirely free from contractual restraints that would

otherwise impair use of such facilities to commence trade, Defendants' precipitation of a boycott

is the source of an injury.

**B.**    **Disruptions to Telephone and Computing Devices**

121.    In the years preceding and following this concerted boycott, I have observed and suffered injury from seizures of information transmitted by telephone and internet. These disruptions include but are not limited to the following:

122.    **Business Data.** In or about May, June, and July of 2017 while researching *Nitrosomonas Europa* and *nitrospira marina* bacteria, I observed unusual disruptions to the flow of information from websites that include the National Institute of Health and National Library of Medicine's National Center for Biotechnology Information at https://www.ncbi.nlm.nih.gov and the journal *Nature* at nature.com.

    a.    Particularly, these disruptions augmented content to reflect inaccurate punctuation and grammar. They also precipitated the generation of inconsistent descriptive information.

123.    At the time, I thought this seemed odd because NCBI and *Nature* are reputable publications that can usually be relied upon to dispense peer-reviewed scientific information.

124.    Granted that usually reliable sources became bastions of misinformation, reason suggests that the cause for these disruptions to the flow of information arise from seizures of data packets in the manner contemplated by 15 CFR §764.3(2)(c)(i), *Export Administration Regulations: Enforcement and Protective Measures; Sanctions, Seizure and Forfeiture* and those associated provisions of the Directorate of Defense Trade Controls providing for the seizure of imported technical data.

    a.    DDTC seizures of imported technical data are particularly relevant to the foregoing since the journal of *Nature* is English and the articles I sought about *nitrospira marina* were authored by the Dutch biologists Daims and Van Kessel.

33

125. **Spanish Class.** In or about October of 2018 while enrolled in Spanish class at the University of Illinois at Chicago I failed a series of computerized, open-book multiple choice vocabulary quizzes administered by a software application.

126. This seemed odd because completing the exercises only required looking up the Spanish translation of a given English word and selecting the corresponding box in an adjacent column, *i.e.*, an exercise that an elementary school child should be able to complete with relative ease.

127. Despite the simplicity of the task and my simultaneous receipt of excellent grades in math and science classes that require faculties for abstract logic, I repeatedly scored 20% and 30% on these sorts of quizzes.

128. On or about three occasions surrounding these injurious disruptions to the proper functioning of software, I purchased clean operating system licenses from Microsoft and paid to have same installed by professionals. These exercises of diligence categorically eliminate the potential for viruses or malware as a causal explanation for disruptions.

129. For lack of an alternative, I posit the underlying problem as attributable to Defendants' effectuation of seizures and manipulation of content before arrival at its terminal destination.

130. **Seizures of Literature.** In or about July of 2019 I began writing my capstone thesis in economics. My paper expounded upon prior art from Arizona State University professor and Federal Reserve Bank economist Edward Prescott and University of Chicago economists Joseph Stiglitz and George Stigler by using regression analysis to measure how real business cycle productivity shocks in the form of changes to government policy impact market conditions.

131. In the course of completing these studies, I identified a series of publications from the Federal Reserve Bank of New York's Economic Policy Review that provided accounts of how the Gramm-Leach Bliley Act, Commodities Futures Modernization Act, and related laws and

regulations augmented who could participate in markets and the terms upon which participation was permitted. After I identified the authors of these research papers on the professional networking website LinkedIn and attempted to make contact with them for the purpose of expressing gratitude for their contributions, I found that: (1) I was no longer able to locate their profiles, and (2) the original research publications that I downloaded to my computer had been seized and replaced with fabricated iterations naming non-existent persons as the authors.

132.    This sort of content-blocking is consistent with sequestration of individuals alleged to be involved in terrorism per descriptions set forth under Title 18 of the United States Code and provisions of the customs laws calling for sanctions.

133.    **Seizures of Market Data.** In late July 2019 I observed a series of seizures of market data from a computer in the University of Illinois at Chicago Richard J. Daley Library that was equipped with licenses for the Bloomberg Terminal.

134.    To this point, I observed actual market data about corporate equities, commodity and security indices, and comparable information be replaced with fabricated information about non-existent entities.

135.    One particularly obvious falsified result that I was able to photograph was the "Korea Rich Dad Hedge Fund." **Exhibit C.(1).**

136.    It is evident that the "Korea Rich Dad Hedge Fund" is a fictitious result because Google queries for a legitimate equity, index of equities, exchange, or other value available for study on the Bloomberg Terminal (*e.g.*, "APPLE", "NASDAQ", or "Chicago Mercantile Exchange") generate a rich array of results.

137.    These results typically give descriptive information about (1) the nature of the equity, index, or exchange (*e.g.*, capital stock, commodity index, or venue of trade), (2) a principal place

of business, (3) the duration of existence, (4) current and historical capitalization values, (5) current and historical prices and information about the volume of exchange, (6) the terms upon which the equity or other institution was founded, (7) information about the present purpose or business, and (8) a website for the company or index or exchange.

138.    If one queries the term "Korea Rich Dad Hedge Fund," there is neither a corresponding set of data that describes what the value is, where it is situated, how long it has existed, how many people trade same and at what prices and quantities, and what business it engages in, nor is there a website.

139.    For absence of the foregoing, reason implores me to believe that the imported data which I sought to complete a paper was seized and replaced with falsified information in the manner provided by elements of the EAR and DDTC.

      a.    It bears mention that the Bloomberg Terminal platform is a vessel for relatively obscure technical data about parties presently subject to OFAC, EAR, and DDTC sanctions (*e.g.*, the Russian Sberbank). **Exhibit C.(2).**

140.    This theory is corroborated by the reality that around the time that I photographed the Bloomberg Terminal displaying the "Korea Rich Dad Hedge Fund" in July of 2019, search results for market-related terms resulted in depictions of information about the rap artist Cardi B on the same Bloomberg Terminal station.

      a.    The inclusion of unsolicited information about a rap artist stood out to me as odd because Bloomberg specializes in provisioning real-time market information from exchanges across the planet rather than entertainment-related media.

141.    **Dating Platforms.** Since at least 2017, I have experienced disruptions to the proper functioning of dating software applications accessible by telephone and internet.

142.  Observable effects of these disruptions have been to repeatedly match me with women who are reportedly situated 5-10,000 miles away in foreign countries like Thailand. This continues to happen despite the fact that I restrict in-app location settings to local searches for potential romantic partners (*e.g.*, within 10 miles) and do not express interest in women outside the United States because I looking to meet a wife and not a pen pal.

143.  Because arriving at a match requires a mutual expression of interest, these occurrences appear to be indicative of malfunctioning equipment and/or seizures.

144.  **Consequential Injuries From Seizures.** Intermediate-level college economics texts uniformly establish that a small business' maximization of profits is contingent upon making efficient business decisions. These texts will continue by noting that efficiency is entirely contingent upon the apprehension of complete and accurate information.

145.  By effectuating seizures that deprive of information relating to scientific knowledge, technical data, component parts, market conditions, and the availability of personnel or collaborators, Defendants have disrupted the free flow of information required to optimally engage in commerce and trade so as to cause an injury in fact.

146.  With greater particularity, the seizures which occurred while Alloyed Enterprises was in passive preparation for trade and actively postured to engage in trade are a source of injury for two primary reasons:

147.  First is that they impaired me from completing the quantitative portion of a 40-page thesis that measures how particular policies affected the volume of exchange in financial markets. This resultant data is of profound commercial value in trade where it is a norm for parties to test strategies using historical data before running them live in actual markets. By partitioning temporal intervals subject of study into discrete regulatory regimes that coincide

with these reforms, it becomes possible to achieve a greater degree of statistical confidence about

how accurately one's models will perform in future periods by accounting for sources of

variation using derived coefficients.

148.    Second is that Alloyed Enterprises would be using the coefficients derived from this

particular study of market performance to trade for its own account with a lower degree of risk

than is otherwise feasible to achieve.

149.    The deprivation of access to the information required to run this assay with scientific

accuracy inflected an injurious delay to trade and passive activities in preparation for trade,

within the meaning of IRS publication 8810.

C.    **Disruptions to Software Affecting Trade**

150.    In addition to the foregoing incidents characteristic of boycotts and seizures, Alloyed

Enterprises and I have suffered injury from disruptions to software affecting trade. The substance

of these disruptions include but are not limited to the following:

151.    On or about March of 2020 I attempted to download the R-Studio interactive

development environment from the Python Anaconda software suite. R-Studio is a software

application commonly used in the sciences to manipulate and assay large batches of data. The

Python Anaconda software suite is an application used by new software developers to sample a

variety of platforms and tools used to learn programming and build apps.

152.    Downloading R-Studio is usually a very simple and straightforward point-and-click

exercise. Nonetheless, when I attempted to execute this very straightforward task, I was subject

to extraordinary delays that preceded inexplicable download failures.

153.    After eventually securing a version of the R-Studio development environment the

following year, I observed that the software of interest did not perform in the manner intended.

To this end, on several occasions in September and October of 2020 I copy-pasted object source code from example scripts written by subject matter experts into the command line of the R-Studio development environment.

154.    When I pressed the return key that usually executes a given set of instructions, I found that the app did not generate the particular results which the expert who provided the instructions indicated they ought to.

155.    Because I was simultaneously able to perform intricate abstractions with pencil on paper in advanced calculus and linear algebra courses that require significantly more cognitive ability than the process of executing simple codes in an interactive development environment, reason has caused me to believe that seizure and manipulation of data packets which the development environment is built from have impaired me from obtaining a properly functioning software development environment required to conduct trade.

156.    Defendants' imposition of encumbrances to my acquisition of software which I acquired license to use is a source of injury in the same way that taking someone's tools before they go to work is a source of injury.

**D.    Disruptions to Trade Facilities *Per Se***

157.    Alloyed Enterprises has access to a trade account provisioned through Interactive Brokers of Greenwich, Connecticut. This account is intended for use trading Treasury securities as a means of showing responsible capital budgeting that satisfies Small Business Administration parameters for companies involved in the manufacture of tangible goods.

158.    Conducting trade in bond markets is contingent upon the timely, rapid, and successive apprehension of current market information, manipulation of market data into actionable information, and execution of trade orders.

159.   On a number of occasions between May 2021 and September 2022 Alloyed Enterprises'

account has been impaired from accessing timely market data. To this end, when requests for

market data have been entered, the software responds with a reply to the effect that the market

data connection is subject to disruption. On several occasions in the same interval, the software

has generated error results noting that the connection has been lost despite the presence of a

functioning internet connection.

160.   For the same reason that it would take longer to receive physical mail if a third-party

deemed it appropriate to open one's personal inbound and outbound papers, read the contents,

make a determination about whether receipt as intended should occur, and then re-enter the

article into the postal service' chain of custody, Defendants' effectuation of seizures have a

preclusive effect upon the feasibility of executing trade in markets where timing is everything.

161.   This problem endures despite the fact that I have all faculties and knowledge required to

execute a limited scope of ultra-low risk trade strategies suitable for use by a small business and

appears likely to persist until an appropriate right-of-way is enforced and injunctive relief against

the Defendants is granted.

## VI.   **Claims for Remedy**

162.   I pray that the court shall reflect on the foregoing assertion of fact, weigh the express

written intentions of Congress for persons injured to receive remedies in the manner set forth

under 50 U.S.C. §4819(f)(3), 22 U.S.C. §401(b), 42 U.S.C. 2000aa-6(a), and 42 U.S.C. §1983 *et*

*seq.* providing for the remedial mitigation of searches, seizures, forfeitures, condemnations,

takings, and other deprivations of protected liberty interests arising from alleged violations of

customs laws and regulations thereunder, and grant the relief sought for the below deprivations

of property and liberty interests:

### Claim the First – Deprivation of Procedural Due Process Rights of Notice and Hearing
*Bivens Remedy from 28 U.S.C. §1331 and 28 U.S.C. §2201 et seq.*
*Suit In Redress by the Civil Rights Act of 1871 at 42 U.S.C. §1983 and §1986*

163.    Plaintiff incorporates by reference all precedent assertions of fact and bases to assert

claims for remedy as if set forth fully herein.

164.    In his article "Some Kind of Hearing," Judge Henry Friendly delineated norms ascribed

to the Fifth Amendment's due process clause. These include notice, the opportunity to be heard,

the right to present evidence and call witnesses, the right to know opposing evidence, the right to

receive a decision based exclusively on the evidence presented, the opportunity to be represented

by counsel, the right to a decision by an unbiased tribunal, and the rights to receive a record of

evidence considered and reasons for decisions.

165.    In the course of taking property and impinging upon protected liberty interests without

notice or hearing, Defendants have exhibited a wanton disregard for the due process of law.

166.    Though Executive Orders 13224, 13372, and 13886 articulate justifications for deviations

from procedural due process, the President's appointees in the executive, *i.e.*, the Defendants, do

not enjoy support from Article II of the Constitution to execute orders which otherwise

contravene legislative mandates issued by the Congress applicable to Alloyed Enterprises'

business. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 US 587 (1952).

167.    Moreover, because these sanctions disrupted my performance of study and trade that the

Congress has deemed to be desirable and which are otherwise protected by international treaties,

and non-party Medcor violated statutes that render it a crime to induce sanctions upon the

unwitting, Defendant's over-reliance on executive orders to impose sanctions should not be

construed as justification for the dispossession of private property and liberty interests on the

grounds of preventing, deterring, or penalizing factually non-existent terrorism. Instead, they

must be viewed as an overzealous application of "presidential polic[ies] executed in a manner

prescribed by the President" rather than authorized or intended by the Congress. *supra*

*Youngstown* at 588.

168.   · As remedy from the consequential harms, I pray the court shall issue an order against the

Defendants for declaratory and injunctive relief proscribing further encroachments, seizures, and

takings of private property without notice and hearing, and further provision an enforced right of

way of the variety acknowledged by the Congress at 33 U.S.C. §1803(e), and further order a

*Bivens* remedy and other and further compensatory relief.

### Claim the Second – Conspiracy to Deprive of Due Process
*Bivens Remedy from 28 U.S.C. §1331 and 28 U.S.C. §2201 et seq.*
*Suit In Redress by the Civil Rights Act of 1871 at 42 U.S.C. §1983 and §1986*

169.   Plaintiff incorporates by reference all precedent assertions of fact and claims for remedy

as if set forth fully herein.

170.   In *Leary v. United States*, 395 US 6 (1969) petitioner Leary argued that the government's

*ex post facto* requirement that he obtain a license to possess cannabis after an arrest by customs

agents violated his privilege of immunity against self-incrimination. The court affirmed Leary's

contention and voided the conviction as unconstitutional.

171.   On 9/13/2022, Special Agent Watson of Defendant BIS opined that I was, in fact,  · ·

induced to violate the Export Administration Regulations governing the export of software

source and/or object code to Palestine by a former employer who appears to have violated the

Sherman Act's proscription against combining with foreign parties so as to cause another to be

subject to restraints of trade.

172.    Agent Watson continued by providing that unless I made a comprehensive disclosure
statement admitting to violations of the EAR, the BIS would not begin to entertain any sort of
administrative remediation of sanctions.

173.    Because EAR sanctions described at 15 CFR §764.3 cite internally to statutes which
criminalize violations of the EAR (*e.g.*, 50 U.S.C. §4819, 22 U.S.C. §2778, and 18 U.S.C.
§1001), and 15 CFR §764.5(d)(5) *Export Administration Regulations: Voluntary Self-Disclosure*
stipulates that referrals for criminal prosecution are a potential disposition of providing a
comprehensive narrative account of alleged violations, the requirement proffered by Agent
Watson that I make comprehensive disclosures of prospectively incriminating information as a
precondition of administrative remediation of sanctions is contrary to the due process clause of
the Fifth Amendment.

174.    As remedy from this deprivation of due process, I pray the court shall enjoin the
Defendants against attempting to abrogate Fifth Amendment norms until an appropriate
equitable resolution has been reached, and further order a *Bivens* remedy and all other and
further relief that the court deems just and proper.

### Claim the Third – Unreasonable Search and Seizure of Personal Property
*Bivens Remedy from 28 U.S.C. §1331 and 28 U.S.C. §2201 et seq.*
*Suit In Redress by the Civil Rights Act of 1871 at 42 U.S.C. §1983 and §1986*

175.    Plaintiff incorporates by reference all precedent assertions of fact and claims for remedy
as if set forth fully herein.

176.    In *Kyllo v. United States*, 533 US 27 (2001) the court held that searches performed
without a warrant using technologies not available to the general public are facially unreasonable
where the accused has a reasonable expectation of privacy.

177.    As an individual and employee of Alloyed Enterprises, I use a virtual private network to
keep health, financial, and other private identifying information and trade secrets private, safe,

and secure. While not an impervious security measure, this technology used in conjunction with secure sockets creates an expectation of privacy similar to a motorist in a vehicle with deeply tinted windows or a caller in a phone booth. *Katz v. United States*, 389 US 347 (1967).

178.    In an interrogatory with Special Agent Watson from Defendant the BIS' Dallas Field Office taken on 9/13/2022, it was given as fact that Defendant BIS employs a few hundred people to fulfill its regulatory mandates of defeating terrorism while supporting the growth of United States exports on a global scale. This gives rise to a ratio of approximately one BIS agent per several million humans on the planet. Consequentially, it is not feasible for the Defendants to perform their duties of scouring web traffic for violations of the export laws manually.

179.    To bridge the gap, Defendants rely upon highly advanced data-mining systems that screen for transactions involving restricted end-users and restricted end-uses indicative of violations of customs laws and terrorist activity. The technology Defendants use to circumvent privacy-enhancing technology is not available to the general public.

180.    Inversely, the practice of using eavesdropping technology capable of conducting population-composite surveillance is either (1) a crime that violates the Computer Fraud and Abuse Act, or (2) a course of conduct that requires registration with the Attorney General, State Department, and Department of Commerce and express promise to cooperate with the government concerning uses of said technology per 47 U.S.C. §1005, *Telecommunications: Cooperation of Equipment Manufacturers and Providers of Telecommunications Services* as it relates to interception of private communications.

181.    With respect to the Congressional mandate that the Attorney General enforce the privacy rights of United States citizens (42 U.S.C. §2000aa, *Privacy Protection: Unlawful Acts; Searches and Seizures By Government Officers and Employees In Connection With Investigation or*

*Prosecution of Criminal Offenses*), the general public's ability to access and use devices of these sorts is so severely restricted as to be factually non-existent.

182.    Because Defendants are statutorily precluded from misusing highly advanced technology to warrantlessly search and seize data by statute and common law but have done so anyway, a violation of my Fourth Amendment liberties has occurred.

183.    As remedy from the consequential injuries, I respectfully pray that the Court enter orders against the Defendants providing for declaratory and injunctive relief proscribing further abuses of process, and create a *Bivens* remedy and other and further relief from the consequential harms, or, in the alternative, require that the Defendants show the warrants and supporting affidavits that allegedly justify their commencement of search and seizures.

### Claim the Fourth – Taking of Mixed Property Without Just Compensation
*Bivens Remedy from 28 U.S.C. §1331 and 28 U.S.C. §2201 et seq. and*
*Replevin Upon the Tucker Act at 28 U.S.C. §1346 and §1491*

184.    Plaintiff incorporates by reference all precedent assertions of fact and claims for remedy as if set forth fully herein.

185.    In the case of *Barron v. Mayor & City Council of Baltimore*, 32 US 243 (1833) partners Craig and Barron procured a small commercial wharf in Baltimore Harbor. This easement was of particular value at the time of purchase because the water beneath the dock was the deepest in the harbor, which permitted for safe and rapid unloading of sharp-hulled ships loaded with cargo.

186.    After a period of time, the City of Baltimore re-graded the surrounding causeways and diverted streamflow using mounds and embankments. These redistributions of streamflow precipitated erosion and deposited silts in the harbor. Eventually, the waters by Barron's wharf became useless for commercial intercourse.

187.    At trial, Barron showed how the City of Baltimore's redistribution of streamflow altered the terroir surrounding his wharf so as to diminish the value of his interest in land. The City

argued that the injury shown was a matter of public nuisance remediation and that Barron held no private right to remedy by the law. The court ultimately ruled that the State's dimunition of the easement's value as a hub of exchange was an injury for which just compensation was due as a taking of private property compensable in tort.

188.    I am similarly situated to the plaintiff in error in that I, as an owner and employee of Alloyed Enterprises, held a useful easement to land appurtenant to inland navigable waterways that was properly licensed for commercial purposes where the Alloyed Company Cruiser was stationed. Defendants' efforts to safeguard a public interest by deterring terrorism using blacklists and seizures that redistribute the flow of information acquired through personal property affixed to the Alloyed Company Cruiser served to diminish the value of these interests to the point of extinguishment of commercial value.

189.    In the case of *Lucas v. South Carolina Coastal Council*, 505 US 1003 (1992) the takings clause was deemed applicable to instances where government regulation serves to negate the economically beneficial use of property reasonably anticipable by the holder in due course. *Lucas* is applicable to this case insofar that blacklisting and seizures have caused the value of real and personal property to diminish by extraordinary amounts.

190.    In *United States v. Causby*, 328 US 256 (1946) the Court held that the government's production of externalities that diminish the value of property in absence of physical intrusion are still takings in the purview of the takings clause. This jurisprudence applies to the takings subject of this complaint insofar that digital seizures are not effectuated through physical intrusion but nonetheless thwart the economically viable use of land and personal property.

191.    The bench from *Presault v. Interstate Commerce Commission*, 494 US 1 (1990) further established that takings of reversionary interests in property (*e.g.*, security interests in land or

internet easements) comprise takings in claims founded upon the takings clause. In *United States v. Dow*, 357 US 17 (1958) it was determined that compensation for the taking is due to the holder in due course. These cases are applicable to the destruction of effervescent interests in TCP/IP protocol leaseholds which the Defendants have seized with such fervor as to effectuate takings.

192.    As remedy from the consequential harms of blacklisting and seizures that restricted the beneficial use of property so thoroughly as to effectuate a regulatory taking, I pray the court shall enter orders against the Defendants for replevin and all other and further remedy and relief which the court deems just and proper.

### Claim the Fifth – Taking of Property Interests In Employment
*Bivens Remedy from 28 U.S.C. §1331 and 28 U.S.C. §2201 et seq. and Replevin Upon the Tucker Acts at 28 U.S.C. §1346 and §1491*

193.    Plaintiff incorporates by reference all precedent assertions of fact and claims for remedy as if set forth fully herein.

194.    In *Board of Regents of State Colleges v. Roth*, 408 US 564 (1972) it was determined that employment comprises a form of property interest protected by the due process clause. This determination was expounded upon in *Haddle v. Garrison*, 525 US 121 (1998) where the court held that when employment is at-will rather than tenured, it is still a protected form of property interest whose diminution in value is compensable in tort.

195.    I have been an employee of Alloyed Enterprises since 2017. As a consequence of Defendants' disregard for due process in the course of enforcing the Export Administration Regulations and Defense Trade Controls, I have suffered injuries from deprivations of access to information and essential business facilities required to conduct trade and demonstrate particularly valuable knowledge and competencies. I have also been excluded from routine avocations that I am otherwise qualified to execute.

196.    These arbitrary and capricious encroachments upon my substantive due process right of
gainful employment have served to decrease the amount of money that I earned relative to what I
could have earned if Defendants did not ignore their obligation to use due process and exercise
reasonable precaution before effectuating sanctions.

197.    As remedy from the consequential injuries, I pray the court enter an order against the
Defendants for compensatory damages and all other and further remedy relief which the court
may deem just and proper.

### Claim the Sixth – Deprivation of Due Process Rights of Association, Speech, and Press Through Seizures of Data Packets
*Bivens Remedy from 28 U.S.C. §1331 and 28 U.S.C. §2201 et seq.*
*Suit In Redress by the Civil Rights Act of 1871 at 42 U.S.C. §1983 and §1986*

198.    Plaintiff incorporates by reference all precedent assertions of fact and claims for remedy
as if set forth fully herein.

199.    At a variety of points between 2014 and present Defendants have set forth encroaching
on telephonic and right-of-way easements so as to impinge my due process rights to associate
freely, disseminate and receive information, and engage in legitimate speech necessary to
vindicate substantive economic rights.

200.    These encroachments upon substantive liberties have been observed occurring on dating
sites, job boards, and on research terminals in University libraries.

201.    While I am cognizant of the fact that the courts have acknowledged limited instances in
which compelling state interests justify restricting freedom of association for expressive
purposes (*e.g.*, in the case of *Roberts v. United States Jaycees*, 468 US 609 (1984)), there is no
such justification to thwart applications of science to the discipline of economics in accord with
express Congressional mandates set forth at 33 U.S.C. §1803 and Dodd-Frank §217.

202.    As remedy from this unlawful encroachment on the fundamental liberties of association,

press, and speech, I respectfully pray the court grant injunctive and declaratory relief proscribing

further arbitrary restrictions of liberty without notice and hearing, and all other remedy and

further compensatory and punitive relief that the bench, in its grace and wisdom, deems to be just

and proper restitution from the injuries set forth herein.

### Claim the Seventh – Recovery of Costs for Study
*33 U.S.C. §1803(e), Study with Respect to Inland Waterways User Taxes and Charges:
Considerations Relating to Federal Assistance and 28 U.S.C. §1492, Judiciary and Judicial
Procedure: United States Court of Federal Claims, Congressional Reference Cases*

203.    Plaintiff incorporates by reference all precedent assertions of fact and claims for remedy

as if set forth fully herein.

204.    33 U.S.C. §1803, *Navigation and Navigable Waters: Inland Waterways Trust Fund:

Study With Respect to Inland Waterway User Taxes and Charges* stipulates that it is in the

express interest of the Congress to appropriate sums for study of how taxes influence small

businesses and industry within the meaning of the antitrust laws, including review of whether the

consequences of same are consistent with policies written in other legislation and the

maintenance of a healthy balance of trade. It is further established that these funds are to be

distributed by the Secretary of Commerce, Secretary of the Treasury, Secretary of Agriculture,

Secretary of Engergy, Secretary of the Army, Director of Management and Budget, Chariman of

the Water Resources Council, and Attorney General of the United States. Consistently with the

foregoing legislative mandate, I studied how Treasury TRACE and OATS micro-taxes affect the

asset-backed securities market transacted via the carriers referenced at 16 U.S.C. §796(8),

*Conservation: Regulation of the Development of Water Power and Resources; Definitions,

Navigable Waters* where "Congress has jurisdiction under its authority to regulate commerce

with foreign nations and among the several States, and which either in their natural or improved

condition… are used or suitable for use for the transportation of persons or property in interstate or foreign commerce."

    a.

205.   Dodd-Frank §217, *Study On International Coordination Relating to Bankruptcy Process for Nonbank Financial Institutions* calls for study of how non-depository financial institutions that endured distress during the 2008 financial crisis accrued insurmountable liabilities on their balance sheets despite the Federal Reserve's extraordinarily generous policy of lending at negative real interest rates.

206.   In accord with this paradigm, I conducted exhaustive study of the only institution which the Department of Justice prosecuted criminally for its role in the 2008 financial crisis. This study culminated in documentation of egresses exploited by extracontinental carriers like the International Swaps & Derivatives Association that functioned as vessels for the expatriation of federal funds by malign foreign actors.

207.   The deliverable results from this course of study include a paper exceeding 10,000 words in length and a deposition *in rei perpetuam memoriam* corroborated by interviews of persons ancient and infirm with knowledge of the parties and subject matter, diagrams, schematics, tables depicting cash flows, reviews of literature, and examinations of chain-of-title documents that conclude with written explanations concerning the mechanics of fraudulent transactions affected by foreign agents to the detriment of the Treasury and public. **<u>Exhibit D.</u>**

208.   Pursuant to the conveyances from the 33 U.S.C. §1803(e), and 28 U.S.C. §2509, I pray that the court shall accord the recovery of nominal costs, an enforced right-of-way to polish studies obscured in part by seizures, and award all other and further remedy and relief deemed to be just and proper.

## Claim the Eighth – Deprivation of Religious Liberty
*Bivens Remedy from 28 U.S.C. §1331 and 28 U.S.C. §2201 et seq.*
*Suit In Redress by the Civil Rights Act of 1871 at 42 U.S.C. §1983 and §1986*

209.   Plaintiff incorporates by reference all precedent assertions of fact and claims for remedy as if set forth fully herein.

210.   Since 2014, Defendants have encroached upon my liberties for the purpose of enforcing export laws that are allegedly justified by the need to deter terrorism.

211.   With respect to Defendants' effectuation of takings without the requisite award of just compensation, seizures of valuable information so as to delay commencement of gainful trade, impingements onto my performance of scholarly pursuits, and exclusion from avocation within the construct of 15 CFR §764.3(c)(2)(i), *Export Administration Regulations; Sanctions, Exclusion From Practice*, Defendants have encroached upon my First Amendment due process right to practice religion.

212.   To this effect, the surname Glimp is Hebrew and I am a jewish. This is pertinent to the present matter for two primary reasons. First is that Judaism places extraordinary emphasis on integrous and diligent scholarship. Second is that a traditional jewish marriage contract sets forth terms under which a husband will provide for his wife economically.

213.   By imposing arbitrary and capricious restrictions on my ability to conduct studies required to earn a living as is necessary and proper to woo a wife and exercise my beliefs, Defendants have unlawfully denied me of the equal protections of the law.

214.   As remedy from these injurious encroachments on liberty, I pray that the court shall enter orders against the Defendants and in favor of the Alloyed Enterprises and I providing for declaratory and injunctive relief and all other and further remedy and relief that it deems to be just and proper.

## VII.   Prayer for Relief

215.   WHEREFORE, I pray that the court shall consider the foregoing statements of facts and claims for remedy and take the following actions:

216.   First, exercise jurisdiction over the subject matter and parties to the extent it is proper;

217.   Second, separate component claims and assign them to the proper forums determined by the Congress, and grant all necessary motions for transfer of venue required to effectuate same;

218.   Third, grant leave to proceed as a non-lawyer seaman in the manner contemplated by 28 U.S.C. §1916 and to effectuate service by the Marshals;

219.   Fourth, grant all necessary motions for discovery by interrogatory and subpoenae *ad testificandum* and *duces tecum* necessary to effectively advocate the claims set forth herein;

220.   Fifth, issue preliminary and permanent injunctions barring the Defendants against further encroaching deprivations of liberty and takings of property without notice and hearing;

221.   Sixth, enter an order providing for an enforced right-of-way to use commencing study and trade in the manners prescribed by the Congress;

222.   Seventh, accord attachments in replevin and for compensatory and punitive damages; and

223.   Eighth, create all other remedy and further relief which the court deems just and equitable or otherwise proper.

## VIII.   Certification and Closing

224.   I, Thomas Madison Glimp, do hereby swear that I have read this complaint and the information contained herein is true and correct.

225.   I also certify that to the best of my knowledge, information, and belief that this complaint is not being presented for an improper purpose such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

226.    I further swear that the arguments contained herein are supported by existing law or by a

nonfrivolous argument for extending or modifying existing law, and that the factual contentions

have evidentiary support that shall be substantiated during discovery, and that the complaint

otherwise complies with the requirements of Rule 11.

Respectfully submitted,

By: _Thomas Madison Glimp_    Executed: _10/13/2022_
Thomas Madison Glimp
Employee-Owner
Alloyed Enterprises Corp.
CO Nonprofit Charter #20171187289
1942 Broadway Street, Ste. 314C
PO Box 4504
Boulder, CO 80306

303-578-8469
tmglimp@alloyedenterprises.com